[Crim. No. 28944. Second Dist., Div. Two. Dec. 16, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT DOUGLAS BANKS, Defendant and Appellant.

## COUNSEL

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, and Charles M. Sevilla, Chief Assistant Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COMPTON, J.**—Defendant appeals from the judgment entered following a jury trial that resulted in his conviction of involuntary manslaughter (Pen. Code, § 192, subd. 2). It was found that he had used a firearm during the commission of the offense (Pen. Code, § 12022.5). He contends: "I. The trial court's extemporaneous jury instruction that the defendant has the burden of proof to show justifiable homicide once the prosecution has proved a homicide committed by defendant was error and clearly prejudicial. II. The Penal Code section 12022.5 'use' of a firearm finding by the jury must be stricken because the statute does not include the crime of involuntary manslaughter. III. Under *People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862], the section 12022 'armed' finding implicitly made by the jury must be stricken because use (being armed with) a firearm was an essential ingredient to the basic crime of involuntary manslaughter under these facts. IV. Section 12022 of the Penal Code does not apply to the felony of involuntary manslaughter on these facts or as a matter of law."

On October 29, 1975 at approximately 10:15 p.m., Stephen Kaufman had engaged in a quarrel with his ex-wife, Karen McGee, outside her family's residence concerning his right to see his child. After Kaufman departed Karen and her two brothers, Lucius and Merlin, being angered at Kaufman's conduct, determined to seek him out and "beat him up." Some 45 minutes to an hour later they observed him driving his car with appellant, with whom they were unacquainted, as a passenger. When Kaufman stopped his vehicle and exited he was set upon by Lucius McGee and a fistfight followed.

Though varying slightly as to details the testimony of the parties concerning the ensuing events was remarkably consistent, with the exception of the version given by Karen. Her hostility and enmity toward her ex-husband and appellant was manifest and a substantial portion of her testimony was refuted by her brother Lucius, Stephen Kaufman, also a People's witness, as well as appellant. A fair reading of the record indicates that initially appellant had remained seated within Kaufman's car. At some point, however, all parties exited their respective vehicles. Each witness agreed that appellant was armed with a pistol and fired several shots into the air, apparently as a warning.

Lucius McGee and Stephen Kaufman, who were struggling on the driver's side of Kaufman's car, did not see the fatal confrontation between appellant and Merlin McGee. Karen McGee testified, contrary to all other witnesses as indicated, that appellant and Stephen Kaufman had been handing the subject gun back and forth to each other and that each of them in turn shot at her or Lucius. She asserted that when her brother Merlin stepped out of his car Kaufman passed the gun back to appellant who proceeded to shoot and kill Merlin without provocation.[1]

Stephen Kaufman, called as a witness by the People, and appellant in his own defense, each testified that after Kaufman's original encounter with Karen at the McGee residence appellant and Kaufman, who were acquaintances, met at a liquor store and Kaufman agreed to drive appellant to the home of appellant's cousin. Appellant did not know Kaufman's ex-wife Karen, or her brothers, and was unaware of the extreme hostility that had developed between them and Kaufman earlier that night. Appellant testified that he had borrowed the gun earlier from his cousin to use on a projected hunting trip which had been canceled.

---

[1]Although Karen McGee denied her brother Merlin had advanced on appellant she acknowledged that his body had fallen between the two cars, i.e., in front of the McGee car and to the rear of Kaufman's car that was parked ahead of it.

He was, therefore, carrying the gun and a clip of bullets in a paper bag with the intention of returning them.

Kaufman testified that while he was fighting with Lucius McGee he saw other persons exiting from the McGee car and heard one of them state, "This is the mother fucker, you're dead now." Appellant, too, averred that he saw others exiting from the McGee car and "The one who come from the back driver's side on the left was going straight to the trunk of the car, and that was as the person got out of the car and made the statements, 'We going to kill you mother fuckers.' " He asserted that he then stepped from his car, loaded the gun and fired three shots into the air, saying, "Hey, we don't have to do this . . . ."

Appellant further testified that he then tripped on the curb and as he was getting up he saw a person, later shown to be Merlin McGee, "coming from behind a pole." Merlin "had black gloves on and . . . a gun in his hand."[2] Appellant fired "trying to disable him . . . [to] keep [him] from shooting me . . . I didn't mean to kill him." After Merlin fell appellant and Kaufman reentered their car and while doing so appellant fired more shots at the McGee vehicle itself to guard their retreat because, he alleged, Lucius McGee had reentered his car and was "digging under the bucket seat" for what appellant feared might be another gun.

Appellant steadfastly maintained his version of the encounter upon cross-examination. When asked to explain what had become of the gun allegedly held by the deceased, appellant replied, "Ask his brother and sister; they've been up here lying; ask them. I have no reason to go out in the street and look for any trouble. I got a home and kids and going into the maintenance business. I have no reason to be going out and getting into something that should have never been."

During the jury's second day of deliberation the foreman sent a written note to the judge stating "a member of the jury would like to know if it is the burden of proof of the defendant to prove self-defense." The following exchange took place: "THE COURT: All right. Well, ladies and gentlemen, there is a reasonably short answer to this particular point.[3] You understand that it is the burden of proof of the People to prove, beyond a reasonable doubt, the elements charged or lesser

[2]Karen McGee confirmed the fact her deceased brother was wearing gloves.
[3]The "short answer," and the only correct answer to the juror's question, was: "No."

included within the charge; that is, the fact that there is a wrongful homicide committed. *If so, at that point, the defense has the burden of proof or it does shift to the defense to prove whether or not the homicide was committed by way of self-defense.* Is that clear to all of you? THE FOREMAN: No, Your Honor. THE COURT: All right. Let's see, Juror No.—that's Mr. Moore. JUROR MOORE: I think I have it basically in my mind, what you are saying. You are saying, if the prosecution does not prove the charge as such—THE COURT: Prove what? JUROR MOORE: If they don't present enough evidence to prove the charge of murder, then—THE COURT: Well, the point is, they must prove the fact that the homicide occurred; when the homicide occurs, then you have to determine whether or not it was a wrongful or a rightful homicide. JUROR MOORE: Now, I understand. THE COURT: And a rightful homicide would be in self-defense. JUROR MOORE: Thank you, Your Honor. THE COURT: But it is, up to that time, the question of whether or not the homicide has been connected with the defendant, you see; and if you reach the conclusion, beyond a reasonable doubt, because that is the burden of the prosecution, that the homicide was committed, then you begin considering whether or not it was one of the privileged-type of homicides under the law, including self-defense. Is that clear to everybody? (The jury answers in the affirmative.) THE COURT: All right. THE FOREMAN: Wait a minute, Your Honor. THE COURT: Yes, Mr. Klein? THE FOREMAN: I want to amplify upon this, I think it might not be fully clear. THE COURT: Now, let's not get into the debate you have in the jury room. THE FOREMAN: Can you—maybe the court reporter could read the statement you made when Mr. Moore asked you the question just before that; that's the statement I want to make sure that everybody understands. THE COURT: Well, I'll state it again if it means anything more. I state that the burden of proof with respect to the homicide itself falls on the State, beyond a reasonable doubt; at that time, the question of defense comes in. If you believe that the State has carried its burden thus far, that is, *in proving the homicide committed by the defendant,* then you may consider the evidence for the purpose of determining if the homicide was justifiable; that is, *was it done in self-defense, and then the burden carrier there is the defendant.* I can't state it any plainer than that. Does anybody feel it is still obscure? (The jury answers in the negative.)" (Italics added.)

 It was error for the trial court to give the jury an extemporaneous instruction which shifted to the defendant the burden of proof that the homicide had been committed in self-defense. "In a criminal case, of course, the defendant is presumed to be innocent and the prosecution

has the burden of proving his guilt beyond a reasonable doubt (Pen. Code, § 1096). Error occurs if a trial court tells a jury that any burden of persuasion rests on the defense as to the general issue of guilt." (*People* v. *Loggins,* 23 Cal.App.3d 597, 600-601 [100 Cal.Rptr. 528].)

The court in *Loggins* even held to be erroneous, though not necessarily prejudicial, the giving of CALJIC No. 5.15 relating to a defendant's procedural burden of coming forward with evidence sufficient "to raise a reasonable doubt as to his guilt of the charge of murder." The court's extemporaneous instruction in the instant case did not purport to simply place a procedural burden on the accused, or require him merely to "raise a reasonable doubt" as to his guilt. Here the court repeatedly advised the jury that the defense was required "*to prove* whether or not the homicide was committed by way of self defense." (Italics added.)

In *Mullaney* v. *Wilbur,* 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881], the United States Supreme Court found to be unconstitutional a state law which affirmatively shifted the burden of proof of justification for a homicide to the defendant. The court held (*Mullaney, supra,* at p. 701 [44 L.Ed.2d at pp. 520-521]), "The result, in a case such as this one where the defendant is required to prove the critical fact in dispute, is to increase further the likelihood of an erroneous murder conviction. Such a result directly contravenes the principle articulated in *Speiser* v. *Randall,* 357 U.S. 513, 525-526 . . .

" '[W]here one party has at stake an interest of transcending value—as a criminal defendant his liberty—th[e] margin of error is reduced as to him by the process of placing on the [prosecution] the burden . . . of persuading the factfinder at the conclusion of the trial. . . .' "

The court in *Mullaney* concluded "that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." (*Mullaney, supra,* at p. 704 [44 L.Ed.2d at p. 522].) Similarly we conclude that the prosecution must prove beyond a reasonable doubt the absence of justification, herein self-defense, when the issue is properly presented in a homicide case. The contrary instruction here given to an obviously confused jury in the midst of deliberation was prejudicial.

The judgment of conviction must be reversed and the cause remanded for a new trial. In so doing we note that appellant may now be retried

only for manslaughter, a charge to which Penal Code section 12022.5 is inapplicable. (See *People* v. *Strickland,* 11 Cal.3d 946, 961 [114 Cal.Rptr. 632, 523 P.2d 672].) Whether or not the provisions of Penal Code sections 3024 and 12022 would be applicable in the event that appellant is convicted upon retrial of manslaughter will depend upon the underlying theory and basis for such conviction.

The judgment is reversed.

Roth, P. J., and Beach, J., concurred.